UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                                                        Case No. 08-CR-339

WAYNE KRUSE,

        Defendant.

## RULE 23(c) DECISION

On December 16, 2008, a grand jury returned an indictment charging Wayne Kruse with conspiring with Lonnie Swaney, his former tax preparer, to defraud the United States, in violation of 18 U.S.C. § 371 (Count One), and three counts of filing false federal income tax returns for the years 2002 through 2004, in violation of 26 U.S.C. § 7206(1) (Counts Two -Four). Kruse waived his right to a jury trial and, with the consent of the government, the case was tried to the Court over one-and-a-half days beginning on April 13, 2009. The defense asked to present its closing argument in writing, and a briefing schedule was set. Having now considered the briefs submitted by the parties, I find the defendant guilty on all four counts based on the evidence presented at trial. In response to the further request of the defense, I will also set out my specific findings of fact pursuant to Fed. R. Crim. P. 23(c). But first I will set forth the elements of the offenses Kruse is alleged to have committed.

## Elements of the Offenses

In order for the Court to find the defendant guilty of conspiracy to defraud the United States as charged in Count One of the Indictment, the government was required to prove the following three elements beyond a reasonable doubt:

> (1) the conspiracy charged in the indictment, i.e., to impede, impair, obstruct, and defeat the function of the Internal Revenue Service ("IRS") of the U.S. Treasury Department in the ascertainment, computation, and collection of federal income taxes during the period from January 2002 through May 2006, actually existed;
>
> (2) the defendant knowingly became a member of the conspiracy with the intent to further the conspiracy; and
>
> (3) an overt act was committed by at least one conspirator in furtherance of the conspiracy.

*Federal Criminal Jury Instructions of the Seventh Circuit,* (hereinafter "*Jury Instructions*") No. 5.08 (1999).

To support a guilty finding on the offense of Filing a False Tax Return as charged in Counts Two through Four, the government was required to prove the following five elements beyond a reasonable doubt:

> (1) the defendant made, or caused to be made, the income tax return in question;
>
> (2) the defendant signed or subscribed the income tax return, which contained a written declaration that it was made under penalties of perjury;
>
> (3) the defendant filed the income tax return, or caused it to be filed, with the IRS;
>
> (4) the income tax return was false as to a material matter as charged in the indictment; and
>
> (5) when the defendant made and signed the tax return, he did so willfully and did not believe that the tax return was true, correct and complete as to every material matter.

*Jury Instructions*, 26 U.S.C. § 7206(1).

2

Information on a tax return is material if it is required to be reported on the tax return and is capable of influencing the correct computation of the amount of tax liability of the individual or the verification of the accuracy of the return. A false matter is material if the matter is capable of influencing the IRS. *Jury Instructions*, 26 U.S.C. § 7206 (Materiality). The word "willfully" means "the voluntary and intentional violation of a known legal duty or the purposeful omission to do what the law requires." *Id.* (Definition of Willfully). A defendant acts willfully if he knows it is his legal duty to file truthful individual tax returns and intentionally files a false return. *Id.*

**Findings of Fact**

The primary, indeed the only, dispute in the case was over whether Kruse had knowingly and willfully acted in concert with his former tax preparer to file false tax returns for the years in question. There was no dispute that Kruse caused tax returns (Forms 1040) to be made and filed with the IRS for 2002, 2003, and 2004. (Exs. 1, 3 and 5.) Because the returns were electronically filed with the IRS, they were signed by Kruse using a personal identification number ("PIN"). Kruse signed, or authorized his bookkeeper to sign on his behalf, the IRS e-file Signature Authorization, Form 8879, for each of the returns in question. (Exs. 2, 4, and 6.) Each of the Forms 8879 authorized Pullen Accounting, which was then owned by Lonnie Swaney, to use his PIN as his signature on the electronically filed tax returns. Thus, Kruse signed and filed, or cause to be signed and filed, each return. Moreover, the returns and the Forms 8879 contained the written declaration made under penalties of perjury, in which Kruse represented that he had reviewed the return (and any accompanying schedules and statements) and that, to the best of his knowledge and belief, the return was true, correct, and complete. Not only do the documents establish these facts,

3

but Kruse acknowledged that the returns were his and that he believed they were correct when he was shown them by Special Agent Jeffrey Luepke. (Tr. 208-14.)

There was also no dispute that each of the returns in question was materially false. Kruse is the owner and operator of Wayne's Caulking, which provides waterproofing for commercial and industrial building projects. Kruse reported his business income and expenses on Schedule C to IRS Form 1040. The Schedule C for each of the returns for tax years 2002 through 2004 substantially overstated the expenses from Kruse's caulking business and thus understated his taxable income and tax liability. Revenue Agent Robert Ulrich testified that he identified several large entries for cost of goods sold in his initial audit of Kruse's returns for 2003 and 2004. He met with Kruse's bookkeeper Jody Zepnick and was shown monthly Profit and Loss Statements, but the invoices or other documentation Zepnick showed him did not support the entries claimed. For example, the monthly statement for December 2003 showed expenses for job materials of $105,803.72. (Ex. 54.) The invoices Zepnick produced to support the entry on the Profit and Loss Statement, however, totaled only $5,803. (Tr. 56.) An entry of $140,000 for cost of materials on the Profit and Loss Statement at the end of 2004 also raised concerns, as did an entry for $175,000 at the end of 2002. (Tr. 198, 205.)

When Special Agent Luepke asked Kruse about these late-year entries for cost of materials, he could not explain where they could have come from since that was his slow time of year and there would be no materials he would have purchased at that time of year that would have cost such an amount. He thought Lonnie Swaney, his tax preparer, had entered it on the ledger. (Tr. 197-98, 206.) Revenue Agent Michael Bake re-calculated Kruse's adjusted gross income and taxes for the years in question from his actual expenses shown in the business' general ledger and, after

4

eliminating the fictitious expenses, concluded that Kruse's business income for the years 2002 to 2004 had been understated by a total of more than $469,000 and that his federal income tax liability for the same years had been under-reported by more than $168,000. (Exs. 44, 45, and 46; Tr. 278-90.) This evidence, largely unchallenged by Kruse, establishes beyond a reasonable doubt that the tax returns for the years 2002 to 2004 that Kruse caused to be made and filed were materially false.

It is on the issues of knowledge and wilfulness that Kruse stakes his defense. He denies he entered into any conspiracy with Swaney to defraud the United States, claims that he had no idea that Swaney was overstating his expenses in this fashion so as to under-report his tax liability, and denies that he willfully filed false tax returns. On these issues, also, I conclude that the government has met its burden. I find from the evidence introduced by the government that Kruse knowingly entered into a conspiracy with Swaney to defraud the United States by overstating his business expenses and under-reporting his adjusted gross income so as to avoid tax liability. I further find that in order to accomplish this objective, Kruse willfully filed false tax returns for each of the years in question. I find Kruse's testimony to the contrary not credible.

At the outset, it is important to note that Kruse was apparently the only person who gained from filing false tax returns. For the three years in question, he avoided over $168,000 in federal income taxes. There is no evidence that Swaney, or anyone else for that matter, profited at all from reporting false information on Kruse's tax returns. It is also important to note that the false information concerning Kruse's business expenses was taken from Kruse's own records. The fictitious late-year entries for cost of materials were made on the Profit and Loss Statements for his business. It is true that Swaney's son Michael apparently made the fictitious entries in the "QuickBooks" software program that Kruse's business used for bookkeeping after it computerized,

5

but that was simply because Zepnick claimed she did not know how to enter the information. (Tr. 152.) Moreover, a copy of an unaltered full-year Profit and Loss Statement for 2004 obtained from Kruse's records contains notations by Lonnie Swaney showing the fictitious additions totaling $199,090. Swaney notes on this pre-adjusted Profit and Loss Statement that Kruse had "saved $74,459. 66 in taxes." (Ex. 14; Tr. 171-73.) These notations, as well as common sense, belie Kruse's suggestion that Swaney was unilaterally overstating the expenses of Kruse's business and understating his income without Kruse's knowledge and consent.

Kruse's inconsistent statements about the high year-end expense entries also demonstrate that he was fully aware of the false entries on his tax returns. When first asked about the $105,000 entry for cost of materials in December 2003, both Kruse and Ms. Zepnick claimed that it was based on invoices that Kruse had since moved to his home because of a lack of storage space at the shop. Ms. Zepnick said she thought Kruse had given her the figure as an estimate at year end. (Tr. 56-57.) When he was first asked, Kruse likewise claimed the figure was based on invoices that he and his sons had since moved to his home because of the lack of space at his shop. He stated he must have totaled them up at year end and called his tax preparer with the number. He had no explanation for why the expenses were not entered by his bookkeeper as they were incurred, what the expenses were for, or what he had done with the invoices the reflected those expenses after they were moved to his home. (Ex. 55; Tr. 61-62.) Yet, when asked about the same figure by Special Agent Luepke less than two months later, Kruse denied knowing where the figure had come from and suggested Swaney must have entered it. (Tr. 197-98.) Gone was the story about a stack of invoices from unknown vendors that had mysteriously disappeared from his home.

6

Additional and powerful evidence of Kruse's wilfulness and knowing participation with Swaney consists of his statement to Special Agent Luepke during his second interview about his conversation with Swaney immediately following the first interview. Kruse told Agent Luepke that when he spoke with Swaney after their first interview, they "agreed to cover each other's backs." (Tr. 207.) When asked what that meant, Kruse responded "Well, we said we wouldn't squeal." (*Id.*) Kruse also told Agent Luepke during the second interview that he knew there was something going on with his tax returns but didn't think it was to the extent shown him by Agent Luepke. (*Id.*)

The record also shows Kruse to be somewhat of a compulsive gambler. He testified that he would go to the casino for a couple of hours every day or every other day to play the slot machines. (Tr. 361-62.) IRS Forms W-2G are issued to a player whenever a slot machine issues a jackpot of $1,200 or more. (Tr. 79.) The Oneida Tribe of Indians of Wisconsin issued Forms W-2G showing Kruse's jackpots over $1,200 from its Bingo and Casino operations amounted to $12,300 in 2003, $133,916 in 2004, and $589,886 in 2005. ("Ex. 56.) Kruse testified that he never reported his winnings on his taxes during this time because he knew he was losing "way more" than he was winning. (Tr. 341.) But after he registered for a VIP players card at the casino in April of 2005, his slot machine activity was recorded whenever he used his card. Confirming Kruse's testimony that he lost more than he won, Casino records show that for the 265 days of 2005 that Kruse had a VIP players card, he lost almost $250,000, despite W-2Gs showing jackpots totaling $589,886. (Exs. 56, 100.) While not directly relevant to the offenses, this evidence suggests a possible motive for his conduct. At the very least, evidence of Kruse's extensive gambling and his failure to report his winnings, which are reportable as income unless offset by documented gambling losses, demonstrate a lack of respect for the tax laws of the country and a willingness to cut corners on his taxes.

7

Finally, the sheer magnitude of the fraud and the amount of money he was taking out as draws for his own use and as loans or gifts to family members strongly suggest that Kruse must have known the tax returns he was filing were false. For each of the three years in question, Kruse reported gross receipts in excess of $1 million, but adjusted gross income of only $135,816 in 2002, $88,815 in 2003, and $106,352 in 2004. During these same years, however, records show he authorized personal draws for himself or for his personal benefit of $216,245 for 2002, $189,853 for 2003, and $330,372 for 2004. In 2004 alone, he took draws more than three times the amount he reported as adjusted gross income. The suggestion that Kruse did so innocently and with no realization that he was defrauding the United States is not credible.

Kruse's own testimony did nothing to alter this analysis of the evidence presented by the government; indeed, his lack of credibility strengthened the case against him. Contrary to his attempt to portray himself as a plain-spoken, hard-working, yet unsophisticated person completely unaware of how much money he was making and spending, and dependent wholly upon an unscrupulous tax preparer who for unknown reasons decided to save him over $168,000 in taxes by understating his adjusted gross income, the record actually shows Kruse to be a smart businessman who has successfully operated a business in a competitive market for more than fifteen years. With employees numbering between seven and fifteen or sixteen, Kruse described how he went about placing bids on commercial or industrial building projects throughout the State of Wisconsin. Kruse personally reviewed the plans for the projects and formulated the bids, taking into consideration the many factors that could effect the overall cost of the portion of the product covered by his bid. (Tr. 323, 355-60.) This was not the work of an unsophisticated man with little knowledge of the economics of his business. When questioned by Agent Luepke, Kruse accurately

8

estimated his annual gross receipts at about $1 million and his profit at between $300,000 and $400,000 per year. (Tr. 193-94.) Despite this general knowledge of his income, he claimed adjusted gross income under penalties of perjury of far less for each year at issue. In light of all of the evidence, his testimony is simply not credible.

Notwithstanding the foregoing, the defense contends that there is no evidence of a conspiracy between Kruse and Lonnie Swaney. Other than an initial introductory visit after Swaney took over the Pullen firm, the defense contends there is no evidence that the two even spoke to each other prior to the IRS investigation. The defense also argues that since Lonnie Swaney did not testify, even though there was evidence he had decided to cooperate with the government, the missing witness instruction would have been appropriate had the case been tried to a jury. For this reason, the defense argues that an inference should be drawn by the Court that Lonnie Swaney's testimony would have been favorable to the defense. This alone, the defense contends, is enough to raise a reasonable doubt.

I draw no inference from the fact that Lonnie Swaney did not testify. Missing witness instructions are appropriate only when a witness is "peculiarly within the government's power to produce." *United States v. DiSantis*, ___ F.3d ____, 2009 WL 1176950, * 8 (7th Cir. May 4, 2009). Kruse made no showing that Lonnie Swaney was peculiarly within the government's control. There is no reason to believe he would not have responded to a subpoena from the defense. Moreover, given the evidence of an agreement between Swaney and Kruse to "cover each other's backs" and to not "squeal" on each other, this case would not be an appropriate one to draw such an inference in any event.

9

The contention that there is no evidence of Kruse and Swaney talking more than once is likewise unavailing. While Kruse may have so testified, I have already noted that his testimony was not credible in other respects, and I see no reason to give it controlling weight on this issue. It is true the government offered no direct evidence of other meetings or conversations between the two prior to the IRS investigation, but the facts certainly warrant an inference that other meetings and/or discussions occurred. The fact that Kruse alone benefitted from the scheme, Swaney's notation on the 2004 Profit and Loss Statement indicating the extent of the benefit, Kruse's inconsistent explanations for the absence of documentation for the year end expenses, and the agreement between the two not to "squeal" all support the inference that Kruse and Swaney had talked more than once.

Even if additional meetings had not taken place, however, this evidence, along with the other evidence described above, convinces the Court beyond a reasonable doubt that Kruse not only filed false tax returns for 2002 through 2004, but that he also entered into a conspiracy with Swaney to defraud the United States. A fact finder may infer the existence of a conspiracy from a defendant's actions, as well as his words. *Roger Whitmore's Auto. Services, Inc. v. Lake County,* 424 F.3d 659, 674 (7th Cir. 2005). Here, both his words and actions establish that Kruse conspired with Lonnie Swaney to defraud the United States. I therefore find the defendant guilty on all four counts of the Indictment.

Dated this   30th   day of May, 2009.

s/ William C. Griesbach
William C. Griesbach
United States District Judge